United States District Court
Southern District of Texas
**ENTERED**
March 30, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BLUE MINT PHARMCO, LLC, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:22-CV-561 |
| | § | |
| TEXAS STATE BOARD OF | § | |
| PHARMACY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is a motion to dismiss filed by Defendants. The motion (Dkt. 20) is **GRANTED**. Plaintiffs' claims for injunctive and declaratory relief are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs' claims for money damages against the individual members of the Texas State Board of Pharmacy in their individual capacities are **DISMISSED WITH PREJUDICE**. Plaintiffs' claims for money damages against the Texas State Board of Pharmacy and against the individual members of the Texas State Board of Pharmacy in their official capacities are **DISMISSED WITHOUT PREJUDICE**.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Blue Mint Pharmco, LLC owns Blue Mint Pharmacy, for which Plaintiff Jona Rushin is the pharmacist-in-charge. (Dkt. 1 at p. 3; Dkt. 22-2 at p. 1).[1] Blue Mint, which "is an African American owned business[,]" has sued the Texas State Board of

---

[1] Plaintiffs' complaint discusses the plaintiffs collectively, so the Court will refer to the plaintiffs collectively as "Blue Mint."

Pharmacy as well as its members in both their individual and official capacities, alleging that the defendants violated Blue Mint's rights under the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution by bringing an unlawful disciplinary proceeding against Blue Mint. (Dkt. 1 at pp. 3–4, 13–16).[2] Blue Mint also brings a claim under 42 U.S.C. § 1981 ("Section 1981"). (Dkt. 1 at p. 15).

*—Disciplinary proceedings for pharmacists*

Texas regulates the pharmacy profession through the Texas Pharmacy Act ("the Act"), which provides that the Board "shall adopt rules consistent with [the Act] for the administration and enforcement of [the Act]." Tex. Occ. Code § 554.051(a); *see also Garrett v. Texas State Board of Pharmacy*, No. 03-21-00039-CV, 2023 WL 365900, at *1 (Tex. App.—Austin Jan. 25, 2023, no pet. h.). A person must hold a license issued by the Board to practice pharmacy in Texas, and a person may not operate a pharmacy unless the pharmacy itself holds a license issued by the Board. Tex. Occ. Code §§ 558.001, 560.001.

Under the Act, "[t]he [B]oard may discipline an applicant for or the holder of a current or expired license to practice pharmacy if the [B]oard finds that the applicant or license holder has" engaged in any of several behaviors enumerated in the Act, including violating the Act; violating a rule adopted by the Board; violating "any pharmacy or drug statute or rule of this state, another state, or the United States;" practicing pharmacy negligently; and dispensing "a prescription drug while acting outside the usual course and

---

[2] As it does with the plaintiffs, Blue Mint's complaint discusses the defendants collectively, so the Court will refer to the defendants collectively as "the Board" for the bulk of this opinion. However, when the Court is discussing the Board's members' assertions of qualified immunity, it will refer to the members collectively as "the individual Board members."

scope of professional practice[.]" Tex. Occ. Code § 565.001(a). Disciplinary sanctions can include, among other things, monetary penalties and the suspension or revocation of a pharmacy license. Tex. Occ. Code §§ 565.051, 566.002. A pharmacist or pharmacy made the object of a disciplinary action by the Board (generally called the "respondent") is statutorily entitled to a contested case hearing before an administrative law judge (or a panel of administrative law judges) at the Texas State Office of Administrative Hearings ("SOAH"). Tex. Occ. Code § 565.061; Tex. Gov't Code § 2001.051.

In a contested case hearing before SOAH, "the [B]oard has the burden to prove that grounds to discipline [the] respondent exist" by a preponderance of the evidence. 22 Tex. Admin. Code § 281.31. The respondent may have counsel at the hearing, and the hearing is generally governed by "[t]he rules of evidence as applied in a nonjury civil case in a district court of [Texas.]" Tex. Gov't Code §§ 2001.053, 2001.081. The respondent may call witnesses (including expert witnesses), depose witnesses, cross-examine witnesses, conduct discovery, present evidence, and object to the Board's evidence. Tex. Gov't Code §§ 2001.081, 2001.084, 2001.087, 2001.091, 2001.092, 2001.094. After the SOAH hearing, the SOAH judge makes a recommendation to the Board in the form of a written "proposal for decision" that includes findings of fact and conclusions of law. Tex. Gov't Code §§ 2001.058, 2003.051; 1 Tex. Admin. Code § 155.507. The parties may file exceptions to the SOAH proposal, and the SOAH judge may amend the proposal in response to the exception briefing. 1 Tex. Admin. Code § 155.507.

Once SOAH has finalized its written proposal, the matter is returned to the Board. Tex. Gov't Code § 2003.051; 1 Tex. Admin. Code § 155.507. The Board may change a

finding of fact or a conclusion of law contained within SOAH's proposal, but only on limited grounds and only if it states its "specific reason and legal basis for [the] change" in writing. Tex. Gov't Code § 2001.058(e). The Board must send a copy of its final decision to SOAH. Tex. Gov't Code § 2003.051(b). Once the Board makes its final decision, a "person . . . who is aggrieved" by the decision may seek judicial review in Texas state court. Tex. Gov't Code § 2001.171; Tex. Occ. Code § 565.061(b).

*—The disciplinary proceeding against Blue Mint*

The disciplinary proceeding against Blue Mint from which this lawsuit stems is ongoing and has thus far followed the procedure outlined above.[3] The Board filed a complaint with SOAH alleging that, during a 15-month period between April of 2019 and July of 2020, Blue Mint essentially became a pill mill at which people obtained two highly addictive controlled substances—hydrocodone, which is an opioid pain medication, and carisoprodol, which is a muscle relaxant—by presenting prescriptions that were "not issued for a legitimate therapeutic purpose or medical need in the regular course of professional practice[.]" (Dkt. 21-1 at pp. 4–6). According to the Board's complaint, Blue Mint "knew

---

[3] Certain aspects of the SOAH proceeding are indisputable and accordingly amenable to judicial notice. The Court may take judicial notice of, for instance, the allegations made by the parties in the SOAH proceeding, the SOAH judges' actions, the fact that certain witnesses testified, and the procedural developments in the SOAH proceeding. *Gray ex rel. Rudd v. Beverly Enterprises-Mississippi, Inc.*, 390 F.3d 400, 407 n.7 (5th Cir. 2004) ("Although we cannot take judicial notice of findings of fact of other courts, the fact that a judicial action was taken is indisputable and is therefore amenable to judicial notice."); *see also Colonial Leasing Co. of New England, Inc. v. Logistics Control Group International*, 762 F.2d 454, 459 (5th Cir. 1985) ("The judicial act itself was not a fact 'subject to reasonable dispute' since Oregon court records constitute 'a source whose accuracy cannot reasonably be questioned.'"). Some documents from the SOAH proceeding have been filed on the docket in this case; for those documents, the Court has included docket citations in this opinion. The Court examined the balance of the SOAH docket by accessing SOAH case number 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 at the following URL: research.txcourts.gov.

or should have known that the majority of the controlled substance prescriptions [for hydrocodone and carisoprodol] referenced [in the Board's complaint] were invalid . . . due to . . . discernable patterns or red flag factors that a reasonable pharmacist should have recognized[.]" (Dkt. 21-1 at pp. 4–6). The "red flag factors" listed by the Board in its complaint were:

A. Prescriptions for hydrocodone and carisoprodol were purportedly authorized exclusively at the highest strength available in tablet form, with no variance;

B. Large quantities were prescribed, including:
   i.   An average of 113 hydrocodone/APAP[4] 10-325 mg tablets per patient; and
   ii.  An average of 85 carisoprodol 350 mg tablets per patient;

C. Controlled substance prescriptions were routinely prescribed as combinations, with patients receiving more than one controlled substance on the same date;

D. The prescriptions indicated a discernible lack of individualized treatment in that patients were receiving the same controlled substances, in the same combinations, at the same maximum strength, from the same prescriber;

E. In addition to prescriptions for large quantities of high strengths of controlled substances, patients were also prescribed dangerous drugs and/or over-the-counter products in discernible patterns; and

F. Opioids such as hydrocodone and muscle relaxants such as carisoprodol are commonly known drugs of abuse—especially in combination.
Dkt. 21-1 at p. 5.

---

[4] "Hydrocodone/APAP" is a combination of hydrocodone and acetaminophen. The dosage listed in the Board's complaint ("10-325") is 10 milligrams of hydrocodone formulated with 325 milligrams of acetaminophen. *See* www.webmd.com/drugs/2/drug-3100/thsc-hydrocodone-apap-oral/details.

The red flag factors cited by the Board in its complaint against Blue Mint were drawn from a larger list of 19 dispensing patterns that the Board has deemed "relevant to preventing the non-therapeutic dispensing of controlled substances" and that is contained in the Texas Administrative Code ("the red flag factors"). *See* 22 Tex. Admin. Code § 291.29(f). The Texas Administrative Code provides that the red flag factors "shall be considered by evaluating the totality of the circumstances rather than any single factor[.]" *Id*.

Blue Mint received a contested case hearing before a panel of SOAH administrative law judges. Blue Mint had counsel present, presented evidence, and called three witnesses, including an expert witness. The SOAH panel issued a 62-page proposal for decision that included extensive findings of fact and conclusions of law and, ultimately, "recommend[ed] that the pharmacist license of Ms. [Jona] Rushin and the pharmacy license of Blue Mint Pharmacy be revoked." Neither Blue Mint nor the Board filed any exceptions to the SOAH panel's proposal for decision, and the SOAH panel returned Blue Mint's case to the Board. The SOAH panel returned the case to the Board very recently—on February 13, 2023—and the Board has not yet taken any action on the SOAH panel's proposal for decision.

—*Blue Mint's allegations in this lawsuit*

In its complaint, Blue Mint brings claims against the Board under 42 U.S.C. § 1983 for violations of the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution. (Dkt. 1 at pp. 13–16). Blue Mint also brings

a claim against the Board under 42 U.S.C. § 1981. (Dkt. 1 at p. 15). Blue Mint's claims are rooted in two complaints about the Board's conduct, which are summarized below.

i.   <u>Blue Mint's first expert witness</u>

First, Blue Mint alleges that the Board deliberately intimidated the first expert witness that Blue Mint designated and that the expert, as a result, refused to testify at the SOAH hearing. (Dkt. 1 at pp. 10–12).

When it received notice from the Board that it was under investigation, Blue Mint retained a pharmacist named Hussam Hamoush ("Hamoush") to serve as an expert witness. (Dkt. 1 at pp. 10–12; Dkt. 27-1 at p. 1). Blue Mint and the Board held an informal settlement conference in an attempt to resolve the matter prior to the initiation of formal SOAH proceedings, and Hamoush offered his expert testimony at that informal settlement conference. (Dkt. 1 at pp. 10–11). According to Blue Mint's complaint in this lawsuit, Hamoush, while formulating his expert opinion, "reviewed [Blue Mint's] prescription data for the period between April 2019 and April 2020[.]" (Dkt. 1 at pp. 10–11).

After the informal settlement conference failed to produce a resolution and the Board filed its SOAH complaint against Blue Mint, the Board notified Hamoush that it had conducted an investigation into his accessing of Blue Mint's patient data to craft his expert opinion. (Dkt. 27-1 at p. 1). According to the Board's notice, the Board's investigation "produced evidence indicating that [Hamoush] may have . . . unlawfully accessed information contained in the Texas Prescription Monitoring Program, in that he accessed the prescription histories of [five] individuals who were not [his] patients, in violation of the Texas Controlled Substances Act." (Dkt. 27-1 at p. 1). When he received the Board's

notice, Hamoush stopped communicating with Blue Mint and "attempted to resign" as Blue Mint's testifying expert. (Dkt. 1 at p. 11). Eventually, Hamoush, represented by his own counsel, entered into an agreed order with the Board in which he agreed to pay an administrative penalty of $1,000 while "neither admit[ting] nor deny[ing]" that his accessing of the patients' data was unlawful. (Dkt. 27-1 at p. 2).

Blue Mint took the matter to one of the presiding SOAH judges in a filing that accused the Board of "intimidation" and sought dismissal of the Board's complaint against Blue Mint (or, in the alternative, other sanctions against the Board) on the basis that the Board's investigation of Hamoush was a "threat[.]" (Dkt. 21-2). In its motion seeking dismissal, Blue Mint alleged to the SOAH judge that someone—Blue Mint's filing did not say who—said to Hamoush "words to the effect that, if [Hamoush] stayed under the Board's radar, his disciplinary matter would be resolved favorably." (Dkt. 21-2 at p. 3). Blue Mint contended that "any expert witness [that it retained] would have to review the [Texas Prescription Monitoring Program] data to render an expert opinion" and that the Board had "unreasonably denied [Blue Mint] an opportunity to meaningfully establish a defense to [the Board's] allegations" by "ma[king] it clear that [reviewing the Texas Prescription Monitoring Program data] would subject [Blue Mint's] expert to disciplinary proceedings." (Dkt. 21-2 at p. 5). The Board filed a response in which it denied that its investigation of Hamoush was an attempt to silence his testimony in the Blue Mint case; to that response, the Board attached an email sent by one of Hamoush's attorneys to a member of the Board's legal staff that confirmed Hamoush's attorneys' understanding that there

was no link between Hamoush's testimony in the Blue Mint case and the Board's investigation of Hamoush. The SOAH judge denied Blue Mint's motion to dismiss.

Blue Mint then designated another expert witness, Neviah Nguyen ("Nguyen"). (Dkt. 21-4). Immediately after Blue Mint's designation of Nguyen, one of the presiding SOAH judges granted an agreed motion for a five-month continuance and referred the case to mediation. (Dkt. 21-5). The mediation was unsuccessful. The Board took no action of any kind against Nguyen, who testified at the SOAH contested case hearing.

In its complaint in this lawsuit, Blue Mint characterizes the Board's investigation of Hamoush as "frivolous" and contends that the Board was deliberately "interfer[ing] with [Blue Mint's] ability to establish a defense to the Board's allegations by bringing [a] meritless disciplinary action against [Blue Mint's] expert witness to prevent him from testifying at the administrative hearing." (Dkt. 1 at pp. 11, 13). Blue Mint also repeats the allegation, originally made to the SOAH judge, that someone—Blue Mint again does not say who—said to Hamoush "words to the effect that, if [Hamoush] stayed under the Board's radar, his disciplinary matter may be resolved favorably." (Dkt. 1 at p. 11). Blue Mint alleges that Hamoush's "access to the [Texas Prescription Monitoring Program data] was entirely legal and proper." (Dkt. 1 at p. 11). In its motion to dismiss briefing, the Board notes that it was required, in any event, to give Blue Mint all of the data that it intended to use before the informal conference at which Hamoush testified. (Dkt. 21 at p. 4). *See* 22 Tex. Admin. Code § 281.22(b)(2). Blue Mint does not allege that the Board violated its disclosure obligations under the Texas Administrative Code.

ii.   Racial discrimination

Second, Blue Mint alleges that "[t]he Board adopted the Red Flag Factors in order to target and discriminate against minority pharmacists and minority-owned pharmacies" and that "[t]he Board also discriminates in its enforcement of violations under the Red Flag Factors." (Dkt. 1 at p. 9).

As evidence of racial discrimination in the Board's disciplinary practices, Blue Mint points to what it contends is a discrepancy between the percentage of pharmacists disciplined by the Board who are Latino or African American and the percentage of pharmacists in general who are Latino or African American. (Dkt. 1 at pp. 7–9). According to Blue Mint's complaint, "[b]ased on the Board's published disciplinary orders, between 2018 through February 1, 2022, the Board discipline[d] approximately two dozen pharmacies and pharmacists based on the Red Flag Factors." (Dkt. 1 at pp. 7–8). Blue Mint claims that "[t]he overwhelming majority" of the disciplined pharmacies and pharmacists "were operating in and around Houston, Texas, and in low-income communities with predominantly minority populations" even though data from the website of the Texas Department of State Health Services shows that, "in 2014, white pharmacists accounted for 51.1% of all pharmacists licensed in Texas, while African American and Latino pharmacists accounted for 14.9% and 10.4%, respectively." (Dkt. 1 at pp. 7–9).

—*The Board's motion to dismiss*

The Board has moved to dismiss Blue Mint's claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting the *Younger* abstention doctrine, sovereign immunity, qualified immunity, and absolute immunity. (Dkt. 21 at p. 2). The Board also

contends that Blue Mint lacks standing because the Board has not issued a final adverse decision in the underlying administrative proceeding and that Plaintiff Blue Mint Pharmco, LLC individually lacks standing because it is not a license holder and is not a party to the underlying administrative proceeding. (Dkt. 21 at p. 2).

At a pre-motion conference on the Board's motion to dismiss, Magistrate Judge Edison granted Blue Mint leave to amend its complaint, so long as Blue Mint filed its amended complaint on or before May 20, 2022. *See* minute entry dated May 3, 2022. Blue Mint has not filed an amended complaint.

## MOTIONS TO DISMISS

### —*Rule 12(b)(1)*

A motion filed under Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge the subject matter jurisdiction of the district court to hear a case. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The party asserting that federal subject matter jurisdiction exists bears the burden of proving it by a preponderance of the evidence. *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777, 781 (5th Cir. 2012). Under Rule 12(b)(1), the court may consider any of the following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Walch v. Adjutant General's Department of Texas*, 533 F.3d 289, 293 (5th Cir. 2008).

### —*Rule 12(b)(6)*

Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.

R. Civ. P. 8(a)(2). A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests a pleading's compliance with this requirement and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming*, 281 F.3d at 161. A complaint can be dismissed under Rule 12(b)(6) if its well-pleaded factual allegations, when taken as true and viewed in the light most favorable to the plaintiff, do not state a claim that is plausible on its face. *Amacker v. Renaissance Asset Mgmt., LLC*, 657 F.3d 252, 254 (5th Cir. 2011); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). As the Fifth Circuit has further clarified:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. This includes the basic requirement that the facts plausibly establish each required element for each legal claim. However, a complaint is insufficient if it offers only labels and conclusions, or a formulaic recitation of the elements of a cause of action.
> *Coleman v. Sweetin*, 745 F.3d 756, 763–64 (5th Cir. 2014) (quotation marks and citations omitted).

When considering a motion to dismiss under Rule 12(b)(6), the Court's review is limited to the complaint; any documents attached to the complaint; any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint; and matters subject to judicial notice under Federal Rule of Evidence 201. *Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir. 2022); *George v. SI Group, Inc.*, 36 F.4th 611, 619 (5th Cir. 2022).

## ANALYSIS

The Court agrees with two grounds for dismissal raised by the Board: (1) the *Younger* abstention doctrine applies; and (2) the individual Board members are entitled to

qualified immunity. The first ground requires dismissal of Blue Mint's claims for declaratory and injunctive relief under Rule 12(b)(1),[5] while the second requires dismissal of Blue Mint's claims for money damages under Rule 12(b)(6).[6] The Court need not reach the Board's other arguments for dismissal.

—Younger *abstention*

The *Younger* abstention doctrine stands for the principle that "federal courts should not enjoin pending state criminal prosecutions unless the plaintiff shows bad faith, harassment, or any other unusual circumstances that would call for equitable relief, such as a flagrantly and patently unconstitutional state statute." *Google, Inc. v. Hood*, 822 F.3d 212, 222 (5th Cir. 2016) (quotation marks omitted) (citing *Younger v. Harris*, 401 U.S. 37, 53–54 (1971)). The *Younger* doctrine applies not only to criminal proceedings but to

---

[5] "Whether *Younger* abstention should be raised under Rule 12(b)(1) or 12(b)(6) is the subject of some dispute." *Morris v. Robinson*, No. A-16-CV-1000, 2017 WL 4510593, at *3 n.5 (W.D. Tex. June 5, 2017), *adopted*, 2017 WL 4506812 (W.D. Tex. July 11, 2017), *aff'd*, 710 Fed. App'x 238 (5th Cir. 2018) (discussing split of authority). There is Fifth Circuit authority going both ways. *Compare Weekly v. Morrow*, 204 F.3d 613, 614–15 (5th Cir. 2000) (indicating that "[f]ederal courts do not abstain on *Younger* grounds because they lack jurisdiction") *with Perez v. Texas Medical Board*, 556 Fed. App'x 341, 342 (5th Cir. 2014) (affirming dismissal under Rule 12(b)(1) on *Younger* grounds). The Court will follow the factually similar *Perez* case and apply the Rule 12(b)(1) standard in this opinion, but the Court notes that it would follow the *Younger* doctrine and dismiss Blue Mint's claims for declaratory and injunctive relief under a Rule 12(b)(6) analysis as well.

[6] Blue Mint appears to concede that sovereign immunity bars its claims for money damages against the Board and against the individual Board members in their official capacities. (Dkt. 22 at pp. 13–14). To the extent that Blue Mint does not so concede, its claims for money damages against the Board and against the individual Board members in their official capacities are **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(1) as barred by sovereign immunity. *See Quern v. Jordan*, 440 U.S. 332, 345 (1979) (holding that 42 U.S.C. § 1983 does not abrogate the states' Eleventh Amendment immunity); *Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1069 (5th Cir. 1981) (holding that 42 U.S.C. § 1981 does not abrogate the states' Eleventh Amendment immunity); *see also Warnock v. Pecos County, Texas*, 88 F.3d 341, 343 (5th Cir. 1996) ("[C]laims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice.").

"certain civil enforcement proceedings akin to criminal prosecutions" and to "pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Hood*, 822 F.3d at 222 (quotation marks and ellipsis omitted). "If state proceedings fit into one of these categories," then the *Younger* doctrine applies if there is: "(1) an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) provides an adequate opportunity to raise federal challenges." *Id*. (quotation marks and ellipsis omitted). The *Younger* doctrine requires dismissal of suits for injunctive and declaratory relief, but not suits for money damages. *Id*.; *see also Alexander v. Ieyoub*, 62 F.3d 709, 713 (5th Cir. 1995).

i.      <u>The *Younger* elements are met.</u>

The Court concludes that Blue Mint's administrative proceeding falls within the second *Younger* category, civil enforcement proceedings that are akin to criminal prosecutions. *Perez v. Texas Medical Board*, 556 Fed. App'x 341, 342 (5th Cir. 2014) (affirming application of the *Younger* doctrine to disciplinary proceeding brought by Texas Medical Board and Texas Physician Assistant Board); *see also Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 432–34 (1982) (applying the *Younger* doctrine to state bar disciplinary proceedings); *Hood*, 822 F.3d at 222 n.5 (citing *Middlesex County* as an example of the second *Younger* category). The Court further concludes that the three *Younger* elements are met. First, Blue Mint's administrative proceeding is still ongoing; the SOAH panel has returned Blue Mint's matter to the Board, which has not yet acted on it. *Perez*, 556 Fed. App'x at 342 ("The matter is then returned to the referring agency . . . . The [Texas Physician Assistant Board] has not yet taken up

Mr. Perez's matter and his disciplinary proceeding is still pending there."). Second, Blue

Mint's administrative proceeding implicates important state interests; "the State of Texas

has a strong interest in protecting the public through the regulation and oversight of those

practicing [pharmacy] in the state." *Id*. Third, Blue Mint has an adequate opportunity to

raise federal challenges, as it "can raise constitutional challenges in the state courts"

because "Texas law provides for judicial review of the administrative decision in the state

courts." *Id*.

ii.    <u>The bad faith exception to the <em>Younger</em> doctrine does not apply.</u>

Blue Mint does not meaningfully contest the applicability of the *Younger* elements.

However, it opposes the Board's invocation of *Younger* nonetheless, arguing that it has

sufficiently alleged "bad faith, harassment, or unusual circumstances warranting equitable

relief." (Dkt. 22 at p. 5). Blue Mint argues that the Board's "conduct in preventing Plaintiffs

from offering [Hamoush's] opinion and prejudicing their ability to retain other experts

amounts to an abuse of prosecutorial discretion." (Dkt. 22 at p. 6). Blue Mint further argues

that "the prosecution was motivated by the fact that Plaintiffs are African American[s]

providing pharmacy services in low-income communities with a high population of racial

minorities." (Dkt. 22 at p. 6).

The Court disagrees with Blue Mint. The bad faith exception to the *Younger*

doctrine "is narrow and is to be granted parsimoniously." *Wightman v. Texas Supreme

Court*, 84 F.3d 188, 190 (5th Cir. 1996); *see also Morris v. Robinson*, No. A-16-CV-1000,

2017 WL 4510593, at *5 (W.D. Tex. June 5, 2017), *adopted*, 2017 WL 4506812 (W.D.

Tex. July 11, 2017), *aff'd*, 710 Fed. App'x 238 (5th Cir. 2018) ("This exception . . . is

rarely applied. Indeed, in a review of Supreme Court cases in this area, the Sixth Circuit did not find a single case where the Court has ever authorized federal intervention under this exception."). "Federal interference with state proceedings, because it necessarily presumes that state court review will be inadequate, affronts the dignity of the state sovereign. . . . Thus, it is only when the state proceeding is brought with no legitimate purpose that this state interest in correcting its own mistakes dissipates, and along with it, the compelling need for federal deference." *Diamond "D" Construction Corp. v. McGowan*, 282 F.3d 191, 200 (2d Cir. 2002). Accordingly, the bad faith exception requires a plaintiff to show "subjective bad faith" by pleading facts that amount to more than "barebones allegations of malicious intent[.]" *Morris*, 2017 WL 4510593 at *7. To illustrate, "[e]xamples of when courts have found bad faith include a Texas city police investigation in which officers repeatedly engaged in searches and seizures which they knew to be unlawful and beyond the scope of statutory authority, and a Southern District of Ohio case in which the county prosecutors had filed twelve separate actions against the federal plaintiffs in order to harass the plaintiffs and drain them of all of their financial resources." *Id.* (collecting cases). The Court will not "assume, without factual support, that [the Board's] actions in investigating [Blue Mint] were taken to harass [Blue Mint] and in bad faith." *Id.*

The facts pled by Blue Mint do not suffice to implicate the bad faith exception to the *Younger* doctrine. For instance, Blue Mint's contention that the Board targeted Hamoush to prevent him from testifying on behalf of Blue Mint is supported by two allegations: (1) that "[Hamoush's] access to the [Texas Prescription Monitoring Program

data on Blue Mint's patients] was entirely legal and proper[;]" and (2) that some unidentified person said to Hamoush "words to the effect that, if [Hamoush] stayed under the Board's radar, his disciplinary matter may be resolved favorably." (Dkt. 1 at p. 11). The first allegation is too conclusory to support a finding of bad faith; Blue Mint admits that Hamoush accessed the patient data, so Blue Mint must provide a great deal more detail regarding exactly what Hamoush did to establish that the Board had no legitimate reason to investigate him—particularly since the Board took no such investigative action against Blue Mint's second expert, Nguyen, who ultimately testified at the SOAH hearing. The second allegation is too vague to support a finding of bad faith; Blue Mint provides no context for the alleged admonition that Hamoush needed to "stay[] under the Board's radar" if he wanted a more favorable resolution to his disciplinary matter, and it is not even clear exactly what was said to Hamoush or by whom. Even assuming that these exact words were said by someone whose statements could be imputed to the Board, Blue Mint has pled no facts indicating that the Board meant "Don't testify for Blue Mint" specifically as opposed to "Stay out of trouble" generally. In short, Blue Mint's allegations regarding Hamoush do not establish that the Board's investigation into Hamoush—much less its investigation into Blue Mint—lacked a legitimate purpose.

Blue Mint's contention that the Board's disciplinary action against it was racially motivated is even more factually deficient. Blue Mint alleges that it has examined the "approximately two dozen" red-flag-factor-related disciplinary orders published by the Board over the period "between 2018 and February 1, 2022" and concluded that "[t]he overwhelming majority" of the disciplined pharmacies and pharmacists "were operating in

and around Houston, Texas, and in low-income communities with predominantly minority populations." (Dkt. 1 at pp. 7–9). Blue Mint provides no other information, except that data from the website of the Texas Department of State Health Services shows that, "in 2014, white pharmacists accounted for 51.1% of all pharmacists licensed in Texas, while African American and Latino pharmacists accounted for 14.9% and 10.4%, respectively." (Dkt. 1 at pp. 7–9). The minimal information provided here gives the Court no basis on which it can compare Blue Mint's case to any other case, let alone a basis on which it can conclude that the Board's investigation of Blue Mint was infected with racial bias and lacked a legitimate purpose.

Blue Mint's claims of bad faith amount to "barebones allegations of malicious intent," which are not enough to create an exception to the *Younger* abstention doctrine. *Morris*, 2017 WL 4510593 at *7. Accordingly, dismissal of Blue Mint's claims for declaratory and injunctive relief is proper under the *Younger* abstention doctrine.

### —*Qualified immunity*

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). When a defendant asserts a qualified immunity defense in a motion to dismiss, the district court must "carefully scrutinize the complaint . . . because qualified immunity means immunity from having to stand trial, not simply immunity from monetary liability." *Kelson v. Clark*, 1 F.4th 411, 416 (5th Cir. 2021) (quotation marks omitted).

The burden is on the plaintiff to demonstrate the inapplicability of the qualified immunity defense. *Id.* A plaintiff seeking to overcome qualified immunity "must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* The plaintiff "must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Morgan*, 659 F.3d at 371 (quotation marks omitted). Courts have discretion to decide which prong of the qualified immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When attempting to show that a right was clearly established at the time of the challenged conduct, "[i]t is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality." *Vann v. City of Southaven, Mississippi*, 884 F.3d 307, 310 (5th Cir. 2018) (quotation marks omitted) ("Plaintiff . . . cited nary a preexisting or precedential case. That alone dooms his case here."). The inquiry "must be undertaken in light of the specific context of the particular case, not as a broad general proposition." *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (brackets and ellipsis omitted). "Although qualified immunity does not require a case in point, existing precedent must have placed the statutory or constitutional question beyond debate[,]" such that "every reasonable official would understand that what she is doing violates that right." *Id*. (brackets and quotation marks omitted).

The Court concludes that the individual Board members are entitled to qualified immunity on all claims for money damages brought against them in their individual

capacities under both 42 U.S.C. § 1983 and 42 U.S.C. § 1981. Blue Mint has not shown that it is "beyond debate" that the individual Board members, whom Blue Mint unhelpfully discusses collectively throughout its complaint, violated its federal statutory or Constitutional rights.

i.   <u>Procedural due process</u>

Blue Mint first contends that its rights under the procedural due process component of the Fourteenth Amendment's Due Process Clause were violated. (Dkt. 1 at pp. 13–14).

Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "By requiring the government to follow appropriate procedures when its agents decide to deprive any person of life, liberty, or property, the Due Process Clause promotes fairness in such decisions." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (quotation marks omitted).

The "fundamental requirement" of procedural due process "is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (quotation marks omitted). "In each individual case, identification of the specific dictates of due process is guided by a *Mathews v. Eldridge* balancing which requires the weighing of the private interests affected by the official action, the risk of erroneous deprivation through the existing procedure, and the government's interest in minimizing its administrative and financial burdens." *Crowe v. Smith*, 151 F.3d 217, 231 (5th Cir. 1998) (quotation marks omitted). Ultimately, the procedural due process inquiry "is flexible and

calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (quotation marks omitted); *see also Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 (1961) ("The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."). "Furthermore, it is well established that, even where the sanction is patently criminal, unless an action violates a specific provision of the Constitution, the due process clause requires only the most basic procedural safeguards." *Crowe*, 151 F.3d at 231 (quotation marks and brackets omitted).

Blue Mint's allegations do not defeat the individual Board members' qualified immunity defenses. In arguing against qualified immunity for the individual Board members on its procedural due process claims, Blue Mint asserts that the "threatening" investigation of Hamoush "prevent[ed Blue Mint] from establishing a defense" in the SOAH proceeding (Dkt. 22 at pp. 17–18)—but, again, Blue Mint has not provided sufficient factual allegations to support its contention that the Board instigated a baseless investigation of Hamoush to scare him away from testifying. Moreover, Blue Mint was able to brief these very allegations to one of the presiding SOAH judges after Hamoush resigned as Blue Mint's expert. Even though the SOAH judge denied relief based on Blue Mint's accusations of witness intimidation, the parties received a five-month continuance and Blue Mint designated another expert, Nguyen, who testified at the SOAH hearing. Notably, the motion for continuance was agreed, and the Board did not take any sort of disciplinary action against Nguyen during the Blue Mint proceeding. The SOAH hearing was a full evidentiary hearing akin to a bench trial at which Blue Mint was able to present

evidence and call witnesses, and the SOAH judges wrote a 62-page opinion setting out their findings and conclusions.

Blue Mint's procedural due process allegations are not sufficient to overcome the individual Board members' qualified immunity. Blue Mint's allegations do not establish that Blue Mint was deprived of a meaningful opportunity to be heard, and Blue Mint has not provided any caselaw placing the issue beyond debate.

ii.   Substantive due process

Blue Mint next contends that its rights under the substantive due process component of the Fourteenth Amendment's Due Process Clause were violated. (Dkt. 1 at pp. 14–15). Substantive due process, unlike procedural due process, "bar[s] certain government actions regardless of the fairness of the procedures used to implement them[.]" *Daniels*, 474 U.S. at 331.

The standard applicable in a substantive-due-process case depends on the type of government action that the plaintiff challenges. When the plaintiff challenges individualized executive action, the plaintiff can only establish a substantive due process violation by showing that "the executive action . . . can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998) (quotation marks omitted); *see also Cripps v. Louisiana Department of Agriculture and Forestry*, 819 F.3d 221, 232–33 (5th Cir. 2016) (applying the shocks-the-conscience standard to a state commission's decision to deny a professional license to the plaintiff). "[O]nly the most egregious official conduct can be

said to be arbitrary in the constitutional sense[.]" *Lewis*, 523 U.S. at 846 (quotation marks omitted).

When a plaintiff proceeding under the substantive due process component of the Due Process Clause challenges legislative or quasi-legislative action that applies broadly and does not implicate a fundamental right, a different standard applies: the plaintiff must show that the governmental action is not "rationally related to a legitimate government interest." *Reyes v. North Texas Tollway Authority, (NTTA)*, 861 F.3d 558, 561–63 (5th Cir. 2017). "The interest the government asserts to show rationality need not be the actual or proven interest, as long as there is a connection between the policy and a conceivable interest." *Id*. at 563 (quotation marks omitted). If the relationship between the challenged governmental action and a legitimate government interest "is at least debatable, there is no substantive due process violation." *Id*. (quotation marks omitted). Rational basis review is "notoriously deferential" to the government. *Id*. at 561–62.

Blue Mint's allegations do not defeat the individual Board members' qualified immunity defenses. In arguing against qualified immunity for the individual Board members on its substantive due process claims, Blue Mint focuses on the red flag factors. Blue Mint contends that, although "preventing the nontherapeutic dispensing of controlled substances is a legitimate objective, there is no rational relationship between the Red Flag Factors and the achievement of that objective" because the red flag factors "are based upon arbitrary statistical parameters without regard to whether the prescriptions were reasonable and medically necessary." (Dkt. 22 at p. 19). In support of that contention, Blue Mint cites the allegation in its complaint that, "[w]hile the Board purports the Red Flag Factors to be

a balancing test based on the circumstances presented, the Red Flag Factors are applied as a bright line rule based on statistical thresholds. For example, a pharmacist can be found in violation of the first factor where the pharmacist dispenses controlled substances in a discernable pattern, regardless of whether the prescription was valid or whether the prescription was reasonable and medically necessary." (Dkt. 1 at p. 7). However, Blue Mint pleads no facts establishing that what it calls the "arbitrary statistical parameters" underpinning the red flag factors are completely disconnected from the prevention of the nontherapeutic dispensing of controlled substances. Under rational basis review, "[t]he means chosen need not be the best for achieving the[] stated ends, but need only be rational in view of those ends." *Montgomery v. Carr*, 101 F.3d 1117, 1130 (6th Cir. 1996). Blue Mint's substantive due process challenge fails if there is "at least [a] debatable" relationship between the red flag factors and some conceivable government interest. *Reyes*, 861 F.3d at 563. This is "a high hurdle" for Blue Mint, *id.*, and its allegations fail to clear it.

Blue Mint's substantive due process allegations are not sufficient to overcome the individual Board members' qualified immunity. Blue Mint's allegations do not establish either that the red flag factors lack a rational relationship to a legitimate government interest or that any one of the individual Board members engaged in conscience-shocking behavior. Moreover, Blue Mint has not provided any caselaw placing the issue beyond debate.

    iii.   Equal Protection: Class of one and protected class

Blue Mint next contends that it has sufficiently pled, under the Fourteenth Amendment's Equal Protection Clause, both a "class of one" equal protection claim and a

claim for "discriminatory enforcement" based on membership in a protected class (race). (Dkt. 22 at p. 19).

A plaintiff bringing a class-of-one equal protection claim must allege "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "To state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff must allege and prove that she received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 227 (5th Cir. 2012) (quotation marks and brackets omitted). With both types of claims, "[b]eing similarly situated is key. Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws." *Hines v. Quillivan*, 982 F.3d 266, 272–73 (5th Cir. 2020) (quotation marks omitted). To determine whether persons or groups are similarly situated, the Court must "inquire as to whether they are in all relevant respects alike." *Texas Entertainment Association, Inc. v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021) (quotation marks omitted). As the Seventh Circuit aptly phrased it in a class-of-one case, "[i]t is clear that similarly situated individuals must be very similar indeed." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004).

Blue Mint does not specifically identify any similarly situated comparators in its complaint. Its only factual allegations regarding dissimilar treatment of similarly situated

groups are its statements claiming that the Board's published disciplinary orders between 2018 through February 1, 2022 show a discrepancy between the percentage of pharmacists disciplined by the Board who are Latino or African American and the percentage of pharmacists in general who are Latino or African American. (Dkt. 1 at pp. 7–9). However, Blue Mint provides no specifics; it pleads no factual allegations establishing that African American pharmacists who have violated particular laws or regulations or who have run afoul of the red flag factors are treated differently from pharmacists of other races who have engaged in the same behavior. *Cf. Bowlby*, 681 F.3d at 227 ("Bowlby pleads no facts to establish that she and the black business owners to whom she broadly refers are similarly situated. For instance, there are no allegations regarding the types of businesses owned by black individuals, the size of their businesses, where they are located, or what laws and regulations they have violated."). Since Blue Mint has not pled facts establishing dissimilar treatment of similarly situated pharmacists, its class-of-one and protected-class allegations fail.

Blue Mint's class-of-one and protected-class allegations are not sufficient to overcome the individual Board members' qualified immunity. Blue Mint's allegations do not establish either that it received treatment different from that received by similarly situated pharmacies or that any unequal treatment stemmed from a discriminatory intent. Moreover, Blue Mint has not provided any caselaw placing the issue beyond debate.

iv.   Equal Protection: facially race-neutral legislation

Blue Mint next contends that it has sufficiently pled "that Defendants enacted the Red Flag Factors with discriminatory intent." (Dkt. 22 at p. 20).

This claim may entail a different legal analysis from the class-of-one and protected-class claims discussed above, as some authority indicates that a plaintiff challenging facially race-neutral legislation may be able to state a claim for racial discrimination under the Equal Protection Clause without identifying a similarly situated comparator. *See Rollerson v. Brazos River Harbor Navigation District of Brazoria County, Texas*, 6 F.4th 633, 640 n.4 (5th Cir. 2021) (noting uncertainty in the law and leaving the question open). Nevertheless, the plaintiff in such a case still must sufficiently plead that the defendant acted with discriminatory intent. *Id*. at 639. To do so, the plaintiff must first plead facts showing that "the challenged action bears more heavily on one race than another." *Id*. (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1979)). "If the disparate impact is clearly unexplainable on grounds other than race, then a court may infer racial animus." *Rollerson*, 6 F.4th at 639 (quotation marks omitted; quoting *Arlington Heights*, 429 U.S. at 266).

"But such cases are rare." *Arlington Heights*, 429 U.S. at 266. Two examples are *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). *Id.* In *Gomillion*, "Local Act No. 140, passed by the Legislature of Alabama in 1957, redefin[ed] the boundaries of the City of Tuskegee" by altering the shape of the city "from a square to an uncouth twenty-eight-sided figure" that "remove[d] from the city all save four of five of its 400 [African-American] voters while not removing a single white voter or resident[,]" thus "depriv[ing] the [African-American] petitioners discriminatorily of the benefits of residence in Tuskegee, including . . . the right to vote in municipal elections." *Gomillion*, 364 U.S. at 340–41. In *Yick Wo*, 200 Chinese launderers were denied the formal

consent necessary to carry on their business under a San Francisco city and county ordinance while "80 others, not Chinese subjects, [we]re permitted to carry on the same business under similar conditions." *Yick Wo*, 118 U.S. at 373–74.

"Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights*, 429 U.S. at 266 (footnotes omitted). *Arlington Heights* sets out five factors to guide the inquiry: (1) the historical background of the decision; (2) the specific sequence of events leading up to the decision; (3) departures from the normal procedural sequence; (4) substantive departures; and (5) legislative history, especially where there are contemporary statements by members of the decision-making body. *Rollerson*, 6 F.4th at 639–40; *see also Arlington Heights*, 429 U.S. at 266–68. The *Arlington Heights* factors "are not exhaustive, and the ultimate determination requires examining the totality of the circumstances." *Rollerson*, 6 F.4th at 640 (quotation marks omitted).

Blue Mint's allegations do not defeat the individual Board members' qualified immunity defenses. Blue Mint alleges in its pleading that "the [red flag] factors were purposely developed [to] single out minority pharmacists providing legitimate services in minority communities and their patients, whose medical needs may result in the prescription patterns the Board arbitrarily deemed to be cause for discipline." (Dkt. 1 at p. 9). Blue Mint further alleges that "the Board purposely provided no safe harbor provisions for pharmacists or pharmacies whose prescription patterns may violate the Red Flag Factors but are nonetheless valid." (Dkt. 1 at p. 9). These statements are conclusory, and Blue Mint provides no facts to support them. Even assuming that Blue Mint has adequately

pled that the red flag factors disparately affect pharmacists of different races, Blue Mint has not pled a stark, obvious pattern of brazen racial discrimination in the nature of *Gomillion* or *Yick Wo*, and it has not pled historical facts under the *Arlington Heights* framework indicating that racial animus played any role in the creation of the red flag factors. Moreover, Blue Mint has not provided any caselaw placing the issue beyond debate.

      v.    <u>Section 1981</u>

Finally, Blue Mint brings a claim under 42 U.S.C. § 1981. (Dkt. 1 at p. 15).

"Section 1981 does not supply a general cause of action for race discrimination. It bars race discrimination *in contracting*." *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 931 (5th Cir. 2021) (quotation marks and citation omitted; emphasis in *Perry*). "Any claim brought under § 1981 must initially identify an impaired contractual relationship under which the plaintiff has rights." *Id*. (quotation marks and ellipsis omitted). "A § 1981 claim fails as a matter of law if the plaintiff lacks rights under the existing (or proposed) contract that he wishes to make and enforce." *Id*. (quotation marks omitted). The contract at issue must be between the plaintiff and the defendant; Section 1981 only allows a non-party to the contract to be held liable when the non-party and a contracting party "are essentially one and the same." *Id*. at 931–33 (quotation marks omitted).

Blue Mint's allegations under Section 1981 do not defeat the individual Board members' qualified immunity defenses.[7] Blue Mint has not identified any particular

---

[7] "Claims against individual public officials under § 1981 are subject to the defense of qualified immunity[.]" *Foley v. University of Houston System*, 355 F.3d 333, 338 (5th Cir. 2003).

contract that is at issue in this lawsuit, much less a contract with any of the individual Board members. Moreover, Blue Mint has not provided any caselaw placing the issue beyond debate.

**CONCLUSION**

Defendants' motion to dismiss (Dkt. 20) is **GRANTED**. Plaintiffs' claims for injunctive and declaratory relief are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs' claims for money damages against the individual members of the Texas State Board of Pharmacy in their individual capacities are **DISMISSED WITH PREJUDICE**. Plaintiffs' claims for money damages against the Texas State Board of Pharmacy and against the individual members of the Texas State Board of Pharmacy in their official capacities are **DISMISSED WITHOUT PREJUDICE**.

SIGNED at Houston, Texas on March 30, 2023.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE